IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DALE BOTTENFIELD,<br><br>Petitioner,<br><br>vs.<br><br>JAMES ROBERTSON, Warden, Pelican Bay State Prison,<br><br>Respondent. | No. 2:19-cv-01105-JKS<br><br>ORDER<br>[Re: Motion at Docket No. 15]<br>and<br>MEMORANDUM DECISION |

Michael Dale Bottenfield, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Bottenfield is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Pelican Bay State Prison. Respondent has answered, and Bottenfield has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On March 9, 2016, Bottenfield was charged with inflicting injury upon a person with whom he had a dating relationship (Count 1) and false imprisonment of another by means of violence, menace, fraud and deceit (Count 2). The information further alleged as to Count 1 that Bottenfield personally inflicted great bodily injury upon the victim and that he had suffered a prior serious felony conviction. Bottenfield pled not guilty and denied the enhancement allegations. He proceeded to a jury trial on March 10, 2016. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Bottenfield and the evidence presented at trial:

> In August 2015, [Bottenfield] lived with his fiancée, C.H., in her apartment in
> Citrus Heights. At that time, C.H. had been an alcoholic for 30 years and had a problem

with methamphetamine. According to C.H., she and [Bottenfield] had been working on their sobriety together.

On the evening of August 31, 2015, [Bottenfield] and C.H. got into an argument after they had consumed alcohol and used methamphetamine. During the argument, [Bottenfield] grabbed C.H. by the throat and strangled her until she lost consciousness. While she was unconscious, [Bottenfield] used duct tape to cover her mouth and bind her wrists and ankles.

When C.H. regained consciousness, she pleaded with [Bottenfield] to let her go. [Bottenfield] disregarded her pleas and strangled her a second time until she lost consciousness. When C.H. regained consciousness the second time, [Bottenfield] helped her remove the duct tape. At that point, C.H. put clothing on, gathered a few things, and ran out of her apartment and called 911.

A police officer named Christopher Light made contact with C.H. in front of her apartment complex. C.H. was crying, somewhat manic, and panicked. She appeared very fearful and wanted to leave the area. Officer Light noticed that she had small red spots on her ankles, and that there was a light redness around her ankles. He also noticed that C.H. had a piece of duct tape on her right ankle. C.H.'s eyes were red and bloodshot, and she had redness around her neck.

C.H. told Officer Light that [Bottenfield] had strangled her until she lost consciousness two times. She also told him that [Bottenfield] had strangled her on numerous occasions in the past but she had never reported the abuse to law enforcement. C.H. did not report that she had been engaged in sex play with [Bottenfield] involving asphyxiation.

C.H. was taken to the emergency room at Mercy San Juan Hospital. The treating physician determined that she had bilateral carotid artery dissections to both carotid arteries in her neck, which is an injury to the inner lining of the arteries. Because her injuries were serious in nature, C.H. was transferred to the intensive care unit where she received treatment for two days. Due to the nature of her injuries, the treating physician was concerned she could suffer a hemorrhage, blood clots, or a stroke.

At trial, C.H. recanted her claims of abuse and claimed she could not remember the details of what occurred during the incident with [Bottenfield]. C.H. testified as follows: [Bottenfield] never physically abused her, and she could not remember whether she told the police there was a history of domestic violence in her relationship with [Bottenfield]. She admitted she did not want to testify. She said she loved [Bottenfield], wanted him to be acquitted, and had told the prosecutor and investigators from his office several times that she did not want to participate in the prosecution of this case. While she acknowledged that she got into an argument with [Bottenfield] on August 31, 2015, she claimed she could not remember much of the argument, except that it started because [Bottenfield] brought alcohol and methamphetamine into her apartment. She also remembered that she was mad at [Bottenfield] for jeopardizing her sobriety. C.H. claimed that she was not afraid of [Bottenfield], and that [Bottenfield] is "really good" as long as he is sober.

After listening to the 911 call, C.H. acknowledged that she told the 911 operator that [Bottenfield] had strangled her to the point where she lost consciousness. She also

acknowledged that she sounded afraid during the call.[FN2]  However, C.H. claimed that she did not remember being strangled.  She only remembered waking up with duct tape on her body.  C.H. also claimed that she could not remember whether she told a detective or a responding police officer that [Bottenfield] had grabbed her by the throat and strangled her until she lost consciousness.

> FN2.   The entire 911 call was played for the jury.  During the call, C.H. reported that [Bottenfield] had "choked" her until she passed out and then placed duct tape on her body.  She explained that she was unable to move or breathe because of the duct tape.

C.H. further claimed she could not remember if she had been engaged in a consensual sex act or bondage activity with [Bottenfield], but explained that [Bottenfield] had strangled her a few times in the past while they were engaged in sexual acts.  According to C.H., she had lost consciousness on one occasion in the past while they were engaged in such activity.

With regard to her memory, C.H. explained that she had "trouble with [her] memory sometimes" because she has fibromyalgia.  She said that she took Norco pills for the pain caused by her condition and Ativan pills to treat her anxiety.  According to C.H., on the day of the incident with [Bottenfield], she had taken four Norco pills, three Ativan pills, and her prescription medication—Abilify (antipsychotic) and Elavil (antidepressant).  C.H. noted that the Ativan pills made her memory "not good."

*People v. Bottenfield*, No. C081998, 2017 WL 6547077, at *1-2 (Cal. Ct. App. Dec. 22, 2017).

At the conclusion of trial, the jury found Bottenfield guilty as charged and also found true the allegation that he personally inflicted great bodily injury.  Bottenfield waived jury trial on the prior serious felony conviction allegation, and the trial court also found it to be true.  The trial court subsequently sentenced Bottenfield to an aggregate imprisonment term of 14 years.

Through counsel, Bottenfield appealed his conviction, arguing that: 1) the prosecution's expert witness violated the court's in limine order during her testimony at trial, the prosecutor committed misconduct in eliciting or attempting to elicit the inadmissible testimony in violation of the same in limine ruling, and counsel was ineffective for failing to object to that testimony; 2) the trial court erred in admitting a jail call between Bottenfield and the victim; 3) the court's admission of prior domestic violence conduct violated his rights to due process and a fair trial;

and 4) the cumulative effect of the errors warranted reversal of his conviction. The Court of Appeal unanimously affirmed the judgment against Bottenfield in a reasoned, unpublished opinion issued on December 22, 2017. *Bottenfield*, 2017 WL 6547077, at *9. The California Supreme Court summarily denied review on March 21, 2018.

Bottenfield timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court dated June 10, 2019. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Bottenfield raises the following claims: 1) the prosecution's expert witness violated the court's in limine order during her testimony at trial; 2) the prosecutor committed misconduct in eliciting or attempting to elicit the inadmissible testimony in violation of the same in limine ruling; 3) trial counsel was ineffective for failing to object to that testimony; 4) the trial court erred in admitting a jail call between Bottenfield and the victim; and 5) the court's admission of prior domestic violence conduct violated his rights to due process and a fair trial.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication

on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.    Merits

The thrust of Bottenfield's *pro se* Petition focuses on three alleged evidentiary errors. The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights. *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930

(9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67).  Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process violations for whether admission of certain evidence "so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72.  A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision."  *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005).  The "[a]dmission of evidence violates due process only if there are *no* permissible inferences the jury may draw from it."  *Boyde*, 404 F.3d at 1172 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)) (internal quotation marks omitted; emphasis in original); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court has not made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus).

1.      *Expert testimony* (Grounds 1-3)

Bottenfield first asserts a number of claims relating to the testimony of a prosecution expert witness.  Specifically, he claims in Ground 1 that the trial court erred in failing to enforce a pretrial *in limine* ruling on the scope of the nurse's testimony regarding strangulation.  In Ground 2, he relatedly argues that the prosecution committed misconduct in eliciting or attempting to elicit testimony that violated the *in limine* ruling.  Finally, he argues that counsel was ineffective for failing to object to the testimony.  The Court of Appeal considered and rejected these claims on direct appeal as follows:

> [Bottenfield's] theory of the case was that the strangulation was consensual; it occurred during consensual sex acts.  The following is a summary of the evidence relevant to [Bottenfield's] claim that, through a combination of prosecutorial misconduct

and trial court error, evidence was improperly placed before the jury due to repeated violations of an in limine ruling.

Prior to trial, the prosecutor filed a motion in limine seeking permission to call Jayne Cohill, a nurse, as an expert witness regarding strangulation. The motion stated that the People intended to call Cohill to testify regarding the significance of strangulation in the context of domestic violence, and offer an opinion as to what the physical evidence—medical records and photographs of C.H.—showed. At the hearing on the motion, the prosecutor explained that he intended to elicit testimony from Cohill about whether C.H.'s injuries were consistent with strangulation, and the role strangulation plays in domestic violence cases. The prosecutor noted that the most important part of her testimony would be to explain why C.H. did not have significant bruising on her neck, despite the fact that she was strangled unconscious. Defense counsel, who had received a statement from the prosecutor describing Cohill's proposed testimony, objected to Cohill's testifying that victims of domestic violence who have been strangled are 700 to 800 percent more likely to be killed by their partner. Counsel stated that, "[T]he fact that people get killed often times of being strangled . . . is highly inflammatory." The parties agreed that an Evidence Code section 402[FN3] hearing was warranted on the issue of Cohill's expertise regarding the role strangulation plays in domestic violence cases.

> FN3.   Undesignated statutory references are to the Evidence Code.

Following Cohill's testimony at the evidentiary hearing, the prosecutor said he intended to elicit testimony from Cohill on "[s]trangulation, the physiological manifestations of the same, and the role of strangulation in the domestic violence context." In response, defense counsel noted that Cohill had "at least twice . . . mentioned people dying, and the effect of dying on domestic violence."[FN4] Counsel stated that he was concerned that Cohill would attempt to inform the jury that C.H. is "going to die . . . soon" because she had been strangled. He argued, "[I] don't think that's a fair . . . expertise," and "I think it's inflammatory." The trial court stated, "I would tend to agree." The court ruled that Cohill could testify but ordered the prosecutor to admonish her not to talk about the percentage of domestic violence strangulation victims "that die, or don't die, or may die." The court reasoned that Cohill's "figures about the number of people who die, or may die, or that [strangulation] leads to death in an escalating pattern [of domestic violence] is not relevant to any issue that's before the jury. [¶] The jury is going to have to decide whether the strangulation . . . was consensual or part of domestic violence." The prosecutor assured the court that he would admonish Cohill not to discuss the "increased . . . lethality in strangulation cases."

> FN4.   During her testimony, Cohill stated that in half of strangulation cases there are no physical marks. However, she explained that when a person has been strangled, they usually have petechiae (i.e., broken blood vessels) on their brain that can be seen during an autopsy. Cohill also noted that C.H. had petechiae in the whites of both of her eyes. When asked by the trial

court whether there is something unique or unusual about strangulation in domestic violence cases, Cohill said: "It is frequently seen in domestic violence cases. It is not usually seen early in the relationship. It tends to be later in the relationship. And all victims do not die. Some do."

When Cohill testified, she opined that C.H.'s injuries were "likely the result of a traumatic injury, and the injury . . . was strangulation." She based her opinion on C.H.'s medical records, the police reports, and the photographs taken of C.H.'s injuries. Cohill stated that there was nothing in the documentation she reviewed to suggest asphyxiation from sex play.

During her testimony, Cohill explained that strangulation is usually not the first thing that happens in an abusive relationship; rather, it often occurs "late in domestic violence relationships." She further explained that as an abusive relationship continues, "it can become more violent, and the ultimate violence is strangulation." In response to the prosecutor's request to describe common physical injuries that appear in strangulation cases, Cohill testified that there are physical signs and symptoms in about half the cases, including marks on the neck, swollen eyes, and a swollen tongue. Cohill explained that in cases where no physical injuries are apparent, it is difficult to determine what happened. However, she explained that damage to the brain is sometimes detected during an autopsy when the victim did not have any physical symptoms of strangulation. Defense counsel objected to this testimony on relevance grounds, but the court overruled the objection and told Cohill she could explain her answer. Cohill continued: "Petechiae . . . are broken blood vessels. Sometimes we see them in the eye rounds and sometimes in the mouth itself. [¶] On autopsy of victims that have been strangled to death, sometimes they have absolutely no outward look that there was anything wrong; and when the brain is autopsied, they find petechiae on the brain itself." Defense counsel objected on relevance grounds, which was overruled.

After a sidebar with counsel, the following exchange occurred:

"[PROSECUTOR:] So, Ms. Cohill, what I take your testimony to be is that ultimately, and given cases where somebody has died, obviously nobody died in this case, but even in cases where somebody has died of a strangulation, outward signs, physiological signs, were not there, but an autopsy revealed the cause of death?

"[COHILL:] Correct.

"[PROSECUTOR:] And that's in the literature?

"[COHILL:] Yes."

Thereafter, Cohill told the jury that C.H. had signs of strangulation, including red marks on her neck and petechiae in the whites of her eyes. She also told the jury that when a victim loses consciousness from strangulation, oxygen to the brain has been limited and the victim often cannot remember anything, and sometimes experiences

traumatic effects, including posttraumatic stress disorder. She explained: "In the . . . act of strangulation, there is great fear and the struggle to survive. And when you're unable to . . . ward off what is happening and you fall into unconsciousness, that is the fear; and the lack of oxygen really gives a person a posttraumatic stress disorder, thinking, you know, that they may die at another time. [¶] So . . . you are sort of playing with death. [¶] This victim did not die, but the thought of the struggle for survival is there." [Bottenfield] did not object to this testimony.

In response to the prosecutor's inquiry as to why perpetrators of domestic violence turn to strangulation, as opposed to hitting, slapping, or kicking the victim, Cohill said: "[Strangulation] is usually not the first thing that happens in a domestic violence relationship. [¶] But when a relationship . . . becomes abusive, [the abuse] sometimes starts as emotional, and then it moves to . . . physical abuse, the ultimate form of power and control is strangulation. [¶] The perpetrator can say to the victim: With this act, I can kill you if I want to. I can . . . let you live if I want to, and you will remember that. [¶] So this is the ultimate form of power and control." [Bottenfield] did not object to this testimony.

On cross-examination, Cohill acknowledged that her opinion that C.H. was strangled was based, in part, on C.H.'s statements following the incident. When defense counsel inquired as to whether Cohill could "say with any certainty" that her opinion would be accurate if C.H.'s statements were not true, the following exchange occurred:

"[COHILL]: Well, there were signs and symptoms of strangulation. So how it happened—in other words, the history that the patient gives fits what we have—what we have knowledge of that we can say that she had as a result of that.

"[DEFENSE COUNSEL]: Okay. And if you didn't have that, then what?

"[COHILL]: If I didn't have which?

"[DEFENSE COUNSEL]: Her statement?

"[COHILL]: You mean if she was strangled to death and then we had to look at it on autopsy?

"[DEFENSE COUNSEL]: I'm [not] sure that's what I was asking you.

"[COHILL]: Well, I'm confused as to what you're asking me."

Defense counsel clarified that his question was whether Cohill's opinion would change if she did not have C.H.'s statements. Cohill responded, "[I]f I'm looking at the results of the testing, no, it doesn't change because you would . . . still see the marks and have the results of the CT with contrast."

*1.2 Analysis*

"[I]t is 'the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' However, 'a judge should be careful not to throw the weight of his [or her] judicial position into a case, either for or against the defendant.' [Citation.] [¶] Trial judges 'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other.'" (*People v. Sturm* (2006) 37 Cal. 4th 1218, 1237.) Nevertheless, a " 'trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias' " or misconduct. (*People v. Farley* (2009) 46 Cal.4th 1053, 1110.) "As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile." (*Sturm, supra*, at p. 1237.)

"" "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, " "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.'" (*People v. Linton* (2013) 56 Cal. 4th 1146, 1205.)

We initially conclude that [Bottenfield] has forfeited his claims of misconduct and largely forfeited his claims of evidentiary error. A review of the relevant portion of the record reveals that defendant made two objections to Cohill's testimony on relevancy grounds. [Bottenfield] did not specifically object to Cohill's testimony on the ground that it ran afoul of the court's pretrial in limine ruling. (*People v. Ledesma* (2006) 39 Cal. 4th 641, 714 [claim of evidentiary error forfeited by counsel's failure to object in the trial court].) Nor did [Bottenfield] interpose an objection on the ground that the prosecutor or the trial court committed misconduct. And, [Bottenfield] has not shown that an objection would have been futile or that an objection and admonition would not have cured the prejudice caused by the alleged misconduct.

More significantly, [Bottenfield's] claims lack merit. The record does not disclose a violation of the trial court's in limine ruling. The prosecutor did not attempt to elicit, and Cohill did not testify about, the percentage of domestic violence strangulation victims who die, or that domestic violence strangulation victims are much more likely to die than domestic violence victims who have not been strangled. Nor was there any testimony elicited that strangulation often leads to death as part of an escalating pattern of domestic violence or that C.H. was likely to die soon because she had been strangled. On

this record, there was no violation of the trial court's in limine ruling and no evidence of misconduct. The record does not show that the prosecutor's questioning of Cohill rendered the trial fundamentally unfair or involved the use of deceptive or reprehensible methods to attempt to persuade the jury. Finally, even assuming the trial court erred in failing to enforce its in limine ruling, erroneous evidentiary rulings do not establish a charge of judicial misconduct. (*People v. Farley*, *supra*, 46 Cal.4th at p. 1110.) Moreover, [Bottenfield] has not shown that the alleged improper admission of Cohill's testimony resulted in a miscarriage of justice. (CAL. CONST., art. VI, § 13 [no reversal for improper admission of evidence unless it resulted in a miscarriage of justice]; § 353, subd. (b) [same].)

Having concluded that testimony was not elicited in violation of the trial court's in limine ruling, defense counsel's failure to object on that basis did not render his assistance ineffective. Defense counsel is not obligated to interpose futile objections. (*People v. Price* (1991) 1 Cal.4th 324, 387.) Moreover, [Bottenfield] has failed to show prejudice. In view of the strong evidence of [Bottenfield's] guilt, we do not think it is reasonably probable that absent the challenged testimony of Cohill, the jury would have reached a verdict more favorable to [Bottenfield]. (*People v. Lucas* (1995) 12 Cal. 4th 415, 436 [prejudice is shown when there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance].)

*Bottenfield*, 2017 WL 6547077, at *3-6.

As an initial matter, because the state appellate court found Bottenfield's evidentiary error and prosecutorial misconduct claims forfeited under California's contemporaneous objection rule, these claims are procedurally defaulted from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004). Because the state appellate court held that these claims

were thereby forfeited under California's contemporaneous objection rule, they may be deemed procedurally defaulted in these proceedings as well.

In any event, these claims also fail on the merits. The Court of Appeals' determination that the challenged testimony did not violate the in limine ruling is both reasonable and fully supported by the record, as is its related determination that the prosecution did not commit misconduct in eliciting the testimony. And because the challenged testimony was admissible, counsel cannot be deemed ineffective for failing to object to it. *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996) (defense counsel's failure to raise a meritless argument or to take a futile action does not constitute ineffective assistance of counsel). Accordingly, Bottenfield is not entitled to relief on any claim related to the expert testimony.

2. *Phone call* (Ground 4)

Bottenfield next argues that the trial court erred in admitting a jail phone call he had with C.H. The Court of Appeal laid out the following facts underlying this claim:

> Prior to trial, the prosecutor filed a motion in limine advising the trial court that, depending on the evidence adduced at trial, the People may seek to admit jail phone calls between C.H. and [Bottenfield]. The prosecutor explained that [Bottenfield] might claim C.H.'s injuries were the result of rough sex, and that C.H. made up her statements to law enforcement. The prosecutor further explained that certain jail conversations could become relevant if C.H. recanted some or all of her statements to law enforcement, said that she did not remember what happened during the incident, or said she made up parts of her statements to law enforcement. At the pretrial hearing on the motion, the prosecutor indicated that he did not intend to introduce the jail phone calls in the People's case-in-chief. Instead, he intended to introduce the phone calls to impeach C.H. Defense counsel indicated he had no objection to the use of the phone calls for that purpose.
>
> At trial, C.H. testified that she visited [Bottenfield] in jail about six times and spoke to him on the phone almost every day. C.H. claimed that they talked about their future together. She denied that he was verbally abusive to her or that he blamed her for being incarcerated. She also denied that he had asked her not to cooperate with the prosecution, to stop talking to the police, or to claim she could not remember what happened. She also denied that he attempted to manipulate her into not participating with

the prosecution. According to C.H., she could not recall a conversation with [Bottenfield] in which she told him, "I was in the ICU. You did this to me."

Sergeant Dennis Prizmitch of the Sacramento County Sheriff's Department testified as an expert on domestic violence. He said that he had observed a pattern in cases involving "intimate partner battering," which he described as a "cycle of violence." He explained that this cycle of violence is also known as "battered women syndrome." He further explained that the most common pattern is that "a couple gets together and everything is nice and loving. Then there's a tension-building phase where tension starts to build between both parties or one party. [¶] And then there's a trigger which causes an incident. Could be violent, could be verbal . . . . And then the parties usually go in their neutral corners and come back together, and the whole cycle starts over again."

When asked to describe common behaviors and reactions of women who are victims of domestic violence, Sergeant Prizmitch described a "rescue phase" in which victims call the police because they want to be rescued and the abuse to stop. After this phase ends, victims often "recant" their claims of abuse, i.e., deny any abuse occurred. He explained that victims will minimize what happened, blame themselves for what happened, or blame other people for their injuries. Victims will also say they "don't want anything done" about the abuse, and will refuse to cooperate with law enforcement or claim they cannot remember what happened. In his experience, 80 to 85 percent of domestic violence victims recant. However, he noted that the literature indicates that only about 50 percent of domestic violence victims recant.

Sergeant Prizmitch testified that victims of domestic violence do not leave their abuser for a variety of reasons, including fear, intimidation, and love. He also said that a lot of victims report having low self-esteem; they explain that they are isolated and do not have anyone to turn to for help. In his experience, most victims of domestic violence stay in their relationship with the batterer. He estimated that more than 75 percent of victims he has encountered stay in a relationship after they have contact with law enforcement.

After he was given a hypothetical that tracked the facts of this case, Sergeant Prizmitch concluded that such behavior is consistent with the cycle of violence in cases involving intimate partner battering.

After C.H. and Sergeant Prizmitch testified, the prosecutor requested permission to introduce an audio recording of a September 10, 2015 jail phone call between C.H. and [Bottenfield]. The prosecutor sought admission of this evidence to impeach C.H.'s testimony that [Bottenfield] never asked her not to cooperate with the prosecution, to show certain admissions made by [Bottenfield] relating to the facts of the incident, and to show that [Bottenfield] attempted to suppress evidence. Defense counsel objected to the admission of the "majority" of the call pursuant to section 352. Defense counsel conceded that portions of the call may be relevant, but suggested that the substance of the call would be unfair to [Bottenfield] because it places him in a bad light, noting that the call was "just a way to dirty up" [Bottenfield], as he used bad language and talked really aggressively during the call. Defense counsel argued the prosecutor wanted to introduce the call to show that [Bottenfield] is unpredictable and emotional, and the phone call is not "a proper avenue for that purpose."

After an extended discussion in which the prosecutor noted that the phone call shows the cycle of violence that Sergeant Prizmitch testified about—the victim is abused and then told she is loved—the trial court listened to the tape. Thereafter, the court ruled that the entire phone call was admissible, except for the portion of the call where [Bottenfield] stated that his cellmate is an "idiot" and was lucky [Bottenfield] had not "choked him out and put him under the bed." In so ruling, the court reasoned that, in addition to [Bottenfield's] trying to persuade C.H. not to cooperate with the prosecution, the overall tone of the conversation shows the emotional manipulation of C.H. and the dominance over her, which was consistent with the testimony of Sergeant Prizmitch regarding the dynamics of partner battering or domestic violence. The court explained that "[t]he relevance . . . of the call is the domestic violence dynamics of [Bottenfield's] manipulating and dominating . . . C.H . . . . [T]o the extent it portrays [Bottenfield] in a bad light, that's the relevance of the tape." The redacted version of the phone call was played for the jury.

*Bottenfield*, 2017 WL 6547077, at *6-8.

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the admission of the phone call was an abuse of discretion or unreasonable or contrary to federal law. Bottenfield argues, as he did on direct appeal, that the trial court erred in its balancing under Evidence Code § 352 because the

inflammatory and prejudicial nature of the evidence far outweighed its probative value given the remoteness and dissimilarity of the other conduct. But to the extent Bottenfield argues that the trial court erred under state law, he cannot prevail on such claim because "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987). So, even if the trial court erred in its application of § 352, such error is not a ground for federal habeas relief. *See Estelle*, 502 U.S. at 67-68.

Moreover, the Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (citing *Williams*, 529 U.S. at 375). Absent such "clearly established Federal law," it cannot be concluded that the appellate court's ruling was an "unreasonable application." *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable). Accordingly, under the strict standards of the AEDPA, Bottenfield is not entitled to relief on this claim either.

3. *Prior domestic violence* (Ground 5)

Finally, Bottenfield claims that the trial court erred in admitting evidence of his prior domestic violence conduct. But again, "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley*, 568 F.3d at 1101.

16

To the extent Bottenfield argues that the prior domestic violence conduct inflamed the jury by suggesting Bottenfield's propensity to commit the present crime, the United States Supreme Court has never held clearly that the introduction of propensity evidence violates due process. *See Estelle*, 502 U.S. at 75 n. 5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting habeas petitioner's challenge to propensity evidence, where petitioner could point to no Supreme Court precedent establishing that admission of otherwise relevant propensity evidence violated the Constitution). In the absence of clearly established Supreme Court law on this issue, AEDPA relief is foreclosed. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (citations and internal quotations omitted); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law") (citation, internal brackets and quotations omitted).

To the extent Bottenfield asserts here his claim, raised on direct appeal, that California Evidence Code § 1109, which provides for admission of evidence of prior domestic violence, and CALCRIM No. 852, which instructs the jury how to consider this evidence, are unconstitutional on their face and therefore violated Bottenfield's rights to due process and equal protection, such claims are also without merit. As the Ninth Circuit held in *United States v. LeMay*, 260 F.3d 1018 (2001), Federal Rule of Evidence 414, which is analogous to California Evidence Code § 1109, "does not discriminate against any group of individuals on the basis of

suspect or quasi-suspect class" because "[s]ex offenders are not a suspect class" and the Rule does not infringe on a fundamental right. *Id.* at 1030-31. Thus, the Ninth Circuit determined that Rule 414 is constitutional so long as it bears a "reasonable relationship to a legitimate government interest." *Id.* at 1031.[1] Here, the class of intimate partner batterers, just as the class of sex offenders, are not a suspect or quasi-suspect class, and § 1109 bears a reasonable relationship to the legitimate government interest in the effective prosecution of domestic violence cases. *See Jensen v. Hernandez*, 864 F. Supp. 2d 869, 925 (E.D. Cal. 2012).

Moreover, California Evidence Code § 1109 does not infringe on a fundamental right because defendants in a criminal trial have "no fundamental right to have a trial free from relevant propensity evidence that is not unduly prejudicial." *Id.* at 1030. As the California Supreme Court held in *Falsetta*, the requirement under § 352 to balance the prejudicial effect of the evidence against its probative value ensures that evidence admitted under § 1109 will not infringe on the right to a fair trial guaranteed under the Due Process Clause. *People v. Falsetta*, 986 P.2d 182 (Cal. 1999).

Even if Petitioner raised a cognizable due process claim, habeas relief would still be unavailable because the admission of evidence was not arbitrary "or so prejudicial that it rendered the trial fundamentally unfair." *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). The admission of evidence violates due process only if there are no permissible inferences that the jury may draw from the evidence. *See Jammal*, 926 F.2d at 920; *see also Terrovona v.*

---

[1]     While no federal Court of Appeals has specifically ruled on the constitutionality of § 1109, several circuit courts have upheld the use of propensity evidence under Rules 413 and 414 of the Federal Rules of Evidence, which are analogous to § 1109. *See, e.g.*, *United States v. Castillo*, 140 F.3d 874, 881 (10th Cir. 1998); *United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998).

*Kincheloe*, 912 F.2d 1176, 1180-81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury cautionary instruction). Here, the testimony related only to the victim's history of unreported domestic violence in her relationship with Bottenfield, which is obviously pertinent to the charged offenses.

In sum, the state appellate court's decision regarding the admission of prior acts of domestic violence was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Bottenfield is not entitled to habeas relief on this ground.

B.      Motion for Appointment of Counsel (Docket No. 15)

Bottenfield also requests the appointment of counsel to assist him in these habeas proceedings. While this Court is not unmindful of the plight of unrepresented state prisoners in federal habeas proceedings, there is no constitutional right to counsel in federal habeas proceedings. *See Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007) (citing *Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991)). Appointment of counsel is not required in a habeas corpus proceeding in the absence of an order granting discovery or an evidentiary hearing. *See* Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 6(a), 8(c). This Court may under the Criminal Justice Act appoint counsel in this case if it determines that the interests of justice so require. 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B); *see Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983) ("In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the

ability of the petitioner to articulate his claims *pro se* in light of the complexity of the legal issues involved.").

Because this case has been fully briefed, and the Court has now considered and adjudicated it on the merits and determined that no Certificate of Appealability should issue, this Court does not so determine. Bottenfield's request for counsel is therefore denied. Bottenfield may renew his request for the appointment of counsel in the event he obtains a certificate of appealability from the Ninth Circuit Court of Appeals.

## V. CONCLUSION AND ORDER

Bottenfield is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Motion for the Appointment of Counsel at Docket No. 15 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

      The Clerk of the Court is to enter judgment accordingly.

      Dated: September 24, 2019.

   /s/James K. Singleton, Jr.      

JAMES K. SINGLETON, JR.

Senior United States District Judge
